# EXHIBIT A

> **This Opinion is Not a Precedent of the TTAB**

Mailed: June 17, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Masimo Corporation*

*v.*

*Pear Therapeutics, Inc.*
_____

Cancellation No. 92073785
_____

Gregory B. Phillips, Mark D. Kachner, and Deborah S. Shepherd
of Knobbe, Martens, Olson & Bear, LLP
     for Masimo Corporation.

Mary A. Hyde, Anessa Owen Kramer, and Ka'Nea K. Brooks
of Honigman LLP
     for Pear Therapeutics, Inc.

_____

Before Bergsman, Wellington, and Adlin,
   Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

   Masimo Corporation ("Petitioner") filed a Petition for Cancellation of the following

two registrations on the Principal Register owned by Pear Therapeutics, Inc.

("Respondent"):[1]

---

[1] 1 TTABVUE (Petition for Cancellation). Citations to the record or briefs in this opinion are to the publicly available documents on TTABVUE, the Board's electronic docketing system.

Cancellation No. 92073785

| Registered Mark | Reg. No. | Goods |
|---|---|---|
| **RESET** (standard characters) | 5138595 | Software for the treatment of substance use disorder, Class 9.[2] |
| **RESET-O** (standard characters) | 5740689 | Software for the treatment of opioid use disorder, namely, software for collecting information and data from and for delivering information and therapy to patients with opioid use disorder, Class 9.[3] |

Petitioner seeks to cancel Respondent's registrations under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), on the ground that Respondent's registered marks, when used on the goods identified in the registrations, so resemble Petitioner's previously-used registered marks (set out below) as to be likely to cause confusion, mistake, or deception:[4]

---

[2] The registration issued on February 7, 2017, and matured from an application that was filed on October 28, 2015.

[3] The registration issued on April 30, 2019, and matured from an application that was filed on October 5, 2017.

[4] Petitioner properly made its pleaded registrations of record by attaching Office electronic database (TESS) copies of its registrations, showing their status and title, with its Petition for Cancellation. Trademark Rule 2.122(d)(1); 1 TTABVUE 32-44 (copies).

Petitioner also pleaded that "Respondent's Alleged Marks shown in Respondent's Registrations will cause, or are likely to cause, dilution of the distinctive quality of Petitioner's SET and RAINBOW SET marks within the meaning of Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c)." 1 TTABVUE 13 (Pet. For Canc. ¶ 31). However, in its trial brief, Petitioner states that it "is not pursuing its claim for dilution by blurring pursuant to Section 43(c)." 44 TTABVUE 13. Accordingly, the dilution claim is not before us.

**EXHIBIT A**

Cancellation No. 92073785

| **Pleaded Registered Mark** | **Reg. No.** | **Goods** |
|---|---|---|
| **SET** (standard characters) | 1941315 | Electronic sensors and monitors for extracting signals from data containing noise, Class 9; and In vivo patient monitors and sensors for detecting a physiological condition, Class 10.[5] |
| **RD RAINBOW SET** (standard characters) | 5839915 | Medical devices, namely, patient monitors and patient sensors for monitoring and measuring blood properties, tissue properties, pulse rate, brain function or respiratory properties, Class 10.[6] |
| **RAINBOW SET** (standard characters) | 5874515 | Medical devices, namely, patient monitors and patient sensors for monitoring and measuring blood properties, tissue properties, pulse rate, brain function or respiratory properties, Class 10.[7] |

---

[5] The registration issued on December 12, 1995, and matured from an application that was filed on February 21, 1995. The registration issued on and has been renewed.

[6] The registration issued on August 20, 2019, based on an application filed on June 19, 2015.

[7] The registration issued on October 1, 2019, based on an application filed on June 19, 2015.

**EXHIBIT A**

Cancellation No. 92073785

| Pleaded Registered Mark | Reg. No. | Goods |
|---|---|---|
| **RD SET** (standard characters) | 5839916 August 20, 2019 | Medical devices, namely, patient monitors and patient sensors for monitoring and measuring blood properties, tissue properties, pulse rate, brain function or respiratory properties, Class 10.[8] |

(Hereinafter, Petitioner's "SET marks").

Petitioner makes the following allegations regarding putative common law rights:[9]

20. In addition to the protection afforded to Petitioner by Petitioner's Registrations, Petitioner has extensive common law rights throughout the United States in Petitioner's Marks for Petitioner's goods and services, including but not limited to the goods identified in Petitioner's Registrations.

21. Petitioner's common law rights in Petitioner's SET and RAINBOW SET marks were established before and predate the filing dates and alleged first use dates of Respondent's Registrations. Therefore, Petitioner's common law rights in Petitioner's SET and RAINBOW SET marks are prior to and superior to Respondent's Alleged Marks subject of Respondent's Registrations.

22. Petitioner's common law rights in Petitioner's SET, RAINBOW SET and RD SET marks were established before and predate the filing date and alleged first use date of Respondent's U.S. Registration No. 5740689. Therefore, Petitioner's common law rights in Petitioner's SET, RAINBOW SET and RD SET marks are prior to and superior to the mark subject of Respondent's Registration No. 5740689.

---

[8] The registration issued on August 20, 2019, based on an application filed on June 19, 2015.

[9] 1 TTABVUE 11-12.

EXHIBIT A

Cancellation No. 92073785

Respondent denied the salient allegations of the Petition for Cancellation in its Answer, and asserted "affirmative defenses" that are not true affirmative defenses, but rather serve to expand upon or amplify its denial of Petitioner's likelihood of confusion claim.[10] *The Mars Generation, Inc. v. Carson*, 2021 USPQ2d 1057, at *4 (TTAB 2021); *DeVivo v. Ortiz*, 2020 USPQ2d 10153, at *1 (TTAB 2020).

The case is fully briefed. To prevail on its Trademark Act Section 2(d) claim, Petitioner must prove by a preponderance of the evidence its entitlement to a statutory cause of action, priority and likelihood of confusion. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000).

## I.     The Evidentiary Record and Petitioner's Objection

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of Respondent's involved registrations. Also, as already noted (see Note 1), Petitioner's four pleaded registrations are of record.

The parties stipulated to the introduction of the following materials from a related proceeding involving the same parties:[11]

---

[10] 10 TTABVUE (Answer). Respondent also sought to "reserve[] all affirmative defenses under the Lanham Act, Federal Rule of Civil Procedure 8(c), and any other affirmative defenses or counterclaims in law or equity that may now exist or in the future exist based on factual investigation or discovery." *Id*. at 8. This request is "improper under the Federal Rules of Civil Procedure, because that would not give … [Petitioner] fair notice of such defenses." *Philanthropist.com, Inc. v. Gen. Conf. Corp. of Seventh-Day Adventists*, 2021 USPQ2d 643, *4 n.6 (TTAB 2021); *see also FDIC v. Mahajan*, 923 F. Supp. 2d 1133, 1141 (N.D. Ill. 2013) ("[A]ffirmative defenses that purport to reserve the right to add affirmative defenses at a later date … are stricken because they are improper reservations under the Federal Rules.").

[11] The parties filed three stipulations, at 13, 39, and 40 TTABVUE. The related proceeding is Opposition No. 91250976.

**EXHIBIT A**

Cancellation No. 92073785

- Testimony deposition of Kristen Budreau, Petitioner's Vice President of Marketing Operations, with accompanying exhibits;[12]

- Respondent's responses to Petitioner's first set of interrogatories;[13] and

- Petitioner's responses and objections to Respondent's first set of interrogatories;[14] and

- Testimony deposition of Kirsten Carlson, Respondent's Vice President of Marketing, with accompanying exhibits.[15]

In addition, Petitioner introduced the following prepared specifically for this case:

- Petitioner's Notice of Reliance on Respondent's responses to Petitioner's first set of admissions requests; a printout of the definition of the term RESET, taken from the Merriam-Webster's online dictionary website; and printouts from the Office's TSDR database for Respondent's uninvolved application Ser. Nos. 87925174 and 87925189.[16]

And Respondent introduced the following prepared specifically for this case:

- Respondent's (first) Notice of Reliance on printouts from Respondent's websites; screenshots of Respondent's LinkedIn page; and screenshots of Respondent's Twitter feed;[17]

- Respondent's (second) Notice of Reliance on printouts of articles posted on third-party websites;[18]

- Respondent's (third) Notice of Reliance on printouts from the USPTO's Trademark Electronic Search System (TESS) for third-party filings and printouts from third-party websites;[19] and

---

[12] 13 TTABVUE (confidential copy); 14-17 TTABVUE (non-confidential copy).

[13] 17 TTABVUE.

[14] Copy submitted with Respondent's (first) Notice of Reliance (31 TTABVUE; Exhib. 1).

[15] 40 TTABVUE (confidential copy); 41 TTABVUE (non-confidential copy).

[16] 18 TTABVUE.

[17] 31-32 TTABVUE.

[18] 33 TTABVUE.

[19] 34-36 TTABVUE.

**EXHIBIT A**

Cancellation No. 92073785

- Testimonial declaration of Kirsten Carlson, with accompanying exhibits.[20]

Petitioner, in an appendix to its trial brief, raises objections to certain documents Respondent introduced in its third Notice of Reliance and moves to strike them.[21] Petitioner contends that these materials are not "printed publication under 37 C.F.R. § 2.122(e)(1) … [do not show] dates or web addresses on the face of the documents as required by [TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP)] 704.08(b) and 37 C.F.R. §2.122(e)(2) [and have] not been identified by specifying the official record as required by TBMP 704.07."[22]

The objected-to materials appear to show use of various registered marks on goods and were offered by Respondent under the third Notice of Reliance for purposes of showing, inter alia, the "number and nature of similar marks on similar goods."[23] In response to Petitioner's objection, Respondent argues:

> [E]ach of these challenged exhibits consists of a specimen of use filed with the USPTO in connection with the registration identified in the row just above it and is part of the official prosecution file for that registration. Accordingly, [Respondent] submits that the Board may consider this evidence in tandem with the accompanying registrations, which are admissible as 'official records' under Board rules. 37 C.F.R. § 2.122(e)(1); *Stx Financing, LLC v. Terrazas*, 2020 WL 5089290 (TTAB 2020) ("Copies of third-party applications or registrations are admissible under notice of reliance as official records under 37 C.F.R. § 2.122(e)(1).").

---

[20] 37 TTABVUE (confidential copy); 38 TTABVUE (non-confidential copy).

[21] 44 TTABUVE 52-58.

[22] *Id.*

[23] 34 TTABVUE (objected-to materials are listed as Exhibs. 21, 29, 31, 33, 37, 39, 41, 43, 49, 53, 55, 59, and 61).

**EXHIBIT A**

Cancellation No. 92073785

Respondent's explanation, for the first time in its trial brief, that the objected-to materials are specimens of use that were submitted by third-parties and are found within the registration files, is untimely. They should have been identified as such in the notice of reliance. Indeed, if allowed at this point, this would place the burden on Petitioner to now, post-trial and after filing its trial brief, review the registration files to confirm that the materials are indeed accurate copies of the specimens as submitted with the underlying applications by the third-party registrants.

Petitioner's request to strike the objected-to materials is granted and they are not given further consideration.[24]

## II.   The Parties

### A. Petitioner

Petitioner, founded in 1989, is a "global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation solutions."[25] The company is involved primarily in the field of pulse oximetry, i.e., the measurement of oxygen saturation of the blood.

---

[24] In any event, even if we were to consider the specimens of use as being associated with certain registration files, and thus constituting official records admissible under notice of reliance, they are lacking in probative value because "allegations of use in a third-party registration do not constitute evidence that the mark shown therein has actually been used." TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 704.04 (2021). Furthermore, specimens from third-party registration files are not evidence of the fact that the specimens filed in the underlying applications are in use today or that such specimens have ever been used. *Allied Mills, Inc. v. Kal Kan Foods, Inc.*, 203 USPQ 390, 397 n.11 (TTAB 1979). In sum, specimens of use submitted as part of registration files, by themselves, are not reliable for purposes of showing the number and nature of similar marks currently in use on similar goods.

[25] 14 TTABVUE; Budreau Dep. 25:11-26:10 (testifying regarding language in Exhib. 1).

EXHIBIT A

Cancellation No. 92073785

According to a SEC Form 10-K filing filed by Petitioner in 2019, pulse oximetry has "gained widespread clinical acceptance as a standard patient vital sign measurement because it can give clinicians a warning of possible hypoxemia [abnormally low blood oxygen] or [an increase in arterial oxygen partial pressure]."[26]

Pulse oximeters are used "in a variety of critical care settings, including surgery, recovery rooms, intensive care units (ICUs), emergency departments and general care floors, as well as alternative care settings, such as long-term care facilities, physician offices and the home monitoring of patients with chronic conditions."[27] Clinicians may also use pulse oximeters to "monitor oxygen saturation in premature babies to ensure that appropriate oxygen saturation levels are maintained."[28]

Petitioner has created a pulse oximetry technology that it calls "Masimo SET" – the latter term, one of Petitioner's pleaded registered marks, is an acronym created and used by Petitioner as an abbreviation for "Signal Extraction Technology."[29] The technology "allows oxygen saturation and pulse rate to be measured through challenging conditions, including movement and low blood flow."[30] The "SET technology" uses algorithms that, as Petitioner's witness explains, are part of the whole system:[31]

---

[26] Budreau Exhib. 2 (Petitioner's SEC Form 10-K filing); see also Budreau Dep. 23:7-26:5 (verifying information from Form 10-K).

[27] *Id*.

[28] *Id*.

[29] Budreau Dep. 48:1-2.

[30] *Id*. at 178:13-18.

[31] *Id*. at 17:16-18:1.

**EXHIBIT A**

Cancellation No. 92073785

> The whole system is, I would say, is a sensor, a patient cable, and that just connects to a device of some kind to display what the readings are. And that device will have the board where the algorithm is, you know, processing all of the information and then showing the clinician or the consumer, the end user, what that value is.

Petitioner sells pulse oximetry clinical products to clinicians or medical professionals, as well as nonclinical pulse oximetry products to consumers.[32]

Petitioner's products are sold to "end users through [Petitioner's] direct sales force and through certain distributors, as well as Petitioner's OEM partners, for incorporation into their products."[33] As to the "OEM partners," these are "other medical device companies that produce medical equipment, and . . . it will not be uncommon for them to offer pulse oximetry as part of their device's solution. And in that case, [Petitioner] will license . . . technology to them [and] sell them a board. They take that board, and they put it into the design of their product, and then there's a port on their device by which [Petitioner's] cable and sensor can plug into it, and then they can get pulse oximetry readings with [Petitioner's] SET technology."[34] In such cases, Petitioner's "SET logo [appears] usually above the port where you plug in the cable" and the "clinician or user need[s] to use a Masimo SET sensor with that Masimo SET technology."[35]

Petitioner's witness testified, as corroborated in Petitioner's SEC Form 10-K filing, that Petitioner is expanding use of its pulse oximetry devices and other

---

[32] *Id.* at 12:5-13:17.

[33] Budreau Dep. 37:1-5.

[34] *Id.* at 37:9-20.

[35] *Id.* at 38:21-39:7 (testifying to Exhib. 2 and language from Petitioner's Form 10-K filing).

EXHIBIT A

Cancellation No. 92073785

technology to various additional patient care settings, and this includes "accurate monitoring with Masimo SET® [to] help reduce the risk of opioid overdose by alerting family members and others when opioids have slowed a patient's breathing and caused a significant drop in oxygen saturation."[36] Petitioner is developing products for "monitoring for opioid overdoses both in the hospital and after the patient leaves" and this is a "very important" growth area for Petitioner.[37] In 2018, the U.S. Food and Drug Administration (FDA) launched an "innovation challenge" to "spur the development of medical devices, including diagnostic tests and digital health technologies (mobile medical applications) to help combat the opioid crisis and achieve the goal of preventing and treating opioid use disorder."[38] Petitioner was selected as one of eight companies, out of 250 applications, for a product in the "overdose therapy" category.[39] Petitioner's application was "based on SET technology" and its selection by FDA allowed it "certain privileges . . . so that [Petitioner] could innovate and create a solution specific to opioid care or reducing the opioid epidemic" and the FDA "would help streamline the process from their side so that the solution could get to market faster."[40]

---

[36] *Id.* at 44:21-46:5; Budreau Exhib. 2.

[37] *Id.* at 47:2-7.

[38] *Id.* at 71:16-74:22; Budreau Exhib. 8 (FDA website printout announcing the innovation challenge and selection of participating companies).

[39] *Id.*

[40] *Id.* at 72:9-13 and 73:13-17.

**EXHIBIT A**

Cancellation No. 92073785

Petitioner continues to market and develop products using its "SET technology" in the field of opioid safety.[41] As reproduced below in one of Petitioner's product materials, one product is "specifically intended for monitoring patients on opioids" and comprises "a wireless pulse oximetry sensor that uses Masimo SET technology [that] communicates to a bedside hub":



.[42]

Petitioner's witness elaborated, based on the above photographs, that the "white small box that you see in the picture . . . takes the [pulse oximetry monitoring] information and transmits it to a cloud, and then that cloud disseminates the information down to a mobile device where a user can see what their values are, what their measurements are."[43] As to the phone in the illustration, it is "part of the system, and it uses a mobile app to display -- it's a [Petitioner]-created app that shows a number of things. It shows your values, and then it has an escalation track in it. You can identify your friends and your doctor and your network, essentially, to

---

[41] See, e.g., *id*. at 75:10-18 and Budreau Exhib. 9 (Petitioner's "Investor Day" presentation outlining "status of company" and "opportunities for growth and [company] trajectory.").

[42] *Id*. at 84:10-85:16; Budreau Exhib. 9 (14 TTABVUE 609-610).

[43] *Id*.

**EXHIBIT A**

Cancellation No. 92073785

become your safety net."[44] The app associated with this system has "a splash screen that prominently displays" the term SET "when the app is turned on."[45] This specific app is intended for clinicians, and cannot be used without prescribed equipment.[46]

## B. Respondent

Respondent is a "digital therapeutics company," combining biology and software technology to create "clinically-validated software-based therapeutics to patients and clinicians" in order to "provide better outcomes, smarter engagement and innovative tracking tools."[47] Respondent's RESET and RESET-O software are its "leading marketed products" and both are described as "12-week programs for outpatient treatment of Substance Use Disorders (SUD) and Opioid Use Disorders (OUD), respectively," with the letter O in the latter mark designating that the software is designed to treat OUD.[48] Respondent's software is used to treat diseases directly and are "evaluated and authorized by regulators like the FDA, and used under the supervision of a prescribing clinician."[49] Although not identified as such in the registrations' identifications, Respondent's witness asserts that its software is a "prescription-only treatment program."[50] Respondent "markets and advertises the

---

[44] *Id.* at 88:3-9.

[45] *Id.* at 200:13-18.

[46] *Id.* at 208:5-6.

[47] 37 TTABVUE (Carlson Dec. ¶ 3).

[48] *Id.*, ¶ 4.

[49] *Id.*, ¶ 7.

[50] *Id.*, ¶ 11. Ms. Carlsen specifically testifies that "a clinician first prescribes the PDT to the patient. The prescription is then received and reviewed by [Respondent's in-house group]" and then, "[a]fter completing its review and determining the patient's need and fit for the

- 13 -

**EXHIBIT A**

Cancellation No. 92073785

RESET and RESET-O" software "through its websites and direct sales consultants to physicians, therapists, clinicians, and counselors/counseling centers who treat patients with" substance and opioid use disorders.[51] Since 2018, Respondent has made significant investments in "promoting, marketing, and advertising" its software.[52] The list price for "treatment through the RESET and RESET-O [prescription digital therapeutic program]" is in the lower four-figure amount "for each product" and this cost "may be covered by a patient's medical insurance."[53] "Over 20,000" patients have been treated using Respondent's RESET or RESET-O software.[54]

## III.   Entitlement to a Statutory Cause of Action

A plaintiff's entitlement to invoke a statutory cause of action for opposition or cancellation is a necessary element in every inter partes case. *Chutter, Inc. v. Great Mgmt. Grp., LLC*, 20201 USPQ2d 1001, at *10 (TTAB 2021) (citing *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021)). To establish entitlement to a statutory cause of action under Trademark Act Section 13, 15 U.S.C., § 1063, a plaintiff must demonstrate "an interest falling within the zone of interests protected by the statute and … proximate causation." *Corcamore,* 2020 USPQ2d 11277, at *4 (citing *Lexmark Int'l, Inc. v. Static*

---

program, [Respondent's in-house group] sends the patient a unique password and link for downloading the PDT and completing the onboarding process." *Id.* at ¶ 13.

[51] *Id.*, ¶ 16.

[52] *Id.*, ¶ 17.

[53] *Id.*, ¶ 20.

[54] 40 TTABVUE (Carlson Dep. 62:8).

EXHIBIT A

Cancellation No. 92073785

*Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067-70 (2014)).[55] Stated another way, a plaintiff is entitled to bring a statutory cause of action by demonstrating a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.,* 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014).

There is "no meaningful, substantive difference between the analytical frameworks expressed in *Lexmark* and *Empresa Cubana*." *Corcamore*, 2020 USPQ2d 11277 at *4. Thus, "a party that demonstrates a real interest in cancelling a trademark under [Trademark Act Section 14, 15 U.S.C.] § 1064 has demonstrated an interest falling within the zone of interests protected by § 1064. … Similarly, a party that demonstrates a reasonable belief of damage by the registration of a trademark demonstrates proximate causation within the context of § 1064." *See Corcamore*, 2020 USPQ2d 11277 at *7.

Petitioner made of record its pleaded registrations for the marks: SET, RD RAINBOW SET, RAINBOW SET, and RD SET. Petitioner therefore has established its interest in marks that are arguably similar thereto, including Respondent's registered marks RESET and RESET-O. Thus, Petitioner's pleaded registrations

---

[55] Our decisions have previously analyzed the requirements of Trademark Act Sections 13 and 14, 15 U.S.C. §§ 1063-64, under the rubric of "standing." We now refer to this inquiry as entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Trademark Act Sections 13 and 14 remain applicable. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020).

**EXHIBIT A**

Cancellation No. 92073785

establish its entitlement to bring a claim for cancellation of Respondent's registrations under Trademark Act Section 2(d). *Cunningham*, 55 USPQ2d at 1844.

## IV.   Priority

We now determine the issue of priority, bearing in mind that "a presumption of validity attaches to" Respondent's involved registrations, and Petitioner, the alleged prior user, bears the burden of proving its claim of priority by a preponderance of the evidence. *West Florida Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1662 (Fed. Cir. 1994); *see also Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 892 F.2d 1021, 13 USPQ2d 1307, 1309 (Fed. Cir. 1989); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1105-06 (TTAB 2007).

## A. Petitioner's Registrations vis-à-vis Respondent's Registrations

"Merely because [Petitioner] properly submitted its . . . [pleaded registrations] into evidence does not mean that it has established priority on its likelihood of confusion claim." *Double Coin Holdings ltd. v. Tru Development*, 2019 USPQ2d 377409, at *4 (TTAB 2019). "'In a cancellation proceeding such as this one where both parties own registrations, priority is in issue.'" *Id.* (quoting *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1474 (TTAB 2014)). However, under Section 7 of the Trademark Act, parties are entitled to rely upon the filing dates of applications underlying the pleaded and subject registrations for purposes of establishing their constructive use dates. 15 U.S.C. §1057(c); *Larami Corp. v. Talk to Me Programs, Inc.*, 36 USPQ2d 1840, 1844 (TTAB 1995) (parties may rely on the constructive use (filing) dates for purposes of priority).

**EXHIBIT A**

Cancellation No. 92073785

In this case, both of Petitioner's pleaded registrations are based on applications that were filed before the filing dates for all of applications that matured into Respondent's involved registrations.[56] Given Petitioner's earlier constructive use (filing) dates and Respondent's failure to make of record any evidence of its prior use, Petitioner has established priority with respect to its registered marks and the goods identified therein. *Calypso Tech. Inc. v. Calypso Capital Mgmt. LP*, 100 USPQ2d 1213, 1219-20 (TTAB 2011) (where respondent did not introduce evidence of earlier use, petitioner's priority established based on the filing date of the underlying application which matured into its pleaded registration).

### B. Petitioner's Asserted Common Law Rights – Tried By Implied Consent But Not Proven

As discussed above, Petitioner asserted prior common law rights. However, Petitioner did not identify with any particularity any goods or services encompassed by its putative prior common rights. Rather, Petitioner vaguely pleaded that its common law rights involved "goods and services, including but not limited to the goods identified in Petitioner's Registrations."[57]

In its trial brief, under the caption of "Petitioner Has Priority of Rights," Petitioner does not argue priority with respect to any goods not covered by its registrations.[58]

---

[56] See Notes 2-3 (identifying application filing dates for Respondent's registrations) versus Notes 5-8 (identifying application filing dates for Petitioner's pleaded registrations).

[57] 1 TTABVUE 11 (Pet. For Canc. ¶ 20).

[58] See 44 TTABVUE 29-31.

**EXHIBIT A**

Cancellation No. 92073785

However, at another point in its trial brief when discussing relatedness of the parties' goods, Petitioner makes the following statements:[59]

> Petitioner has also established that since the mid-1990s, it has continuously used its SET and RAINBOW SET marks in connection with signal processing software algorithms for pulse oximeters and CO-oximeters that measure, process and report professional medical and personal health parameters. Petitioner offers various mobile apps in connection with its professional and personal monitoring devices that utilize Petitioner's SET and RAINBOW SET technology, which enable the user to view collected medical and health information on a tablet or mobile phone (e.g., Apple or Android). Based on this long history of providing the best monitoring solution, the FDA awarded Petitioner the opportunity to design a monitoring device using Petitioner's SET technology in connection with opioid addiction programs.

Respondent, in its brief, points out that Petitioner's pleaded registrations do not cover "software," nor "did [Petitioner] allege prior use of its SET mark in connection with 'software' in its Petition for Cancellation.[60] Respondent therefore asks that the Board disregard Petitioner's claim of prior use in connection with software because it is "misleading and inappropriate."[61]

Petitioner, in its rebuttal brief, does not address its failure to plead common law rights for software, but simply reiterates that it possesses "senior common law rights in the SET Marks for software."[62]

Although Petitioner alleged common law rights with regard to "goods and services, including but not limited to the goods identified in Petitioner's Registrations," this is

---

[59] 44 TTABVUE 39. Internal citations omitted.

[60] 45 TTABVUE 32-33.

[61] *Id*.

[62] 47 TTABVUE 7.

EXHIBIT A

Cancellation No. 92073785

hopelessly non-specific. Indeed, this wording could include any type of goods or services in addition to those identified in Petitioner's pleaded registrations. Respondent was not put on notice that Petitioner intended to rely at trial on any common law rights in any of its marks for software. *See Phillies v. Phila. Consol. Holding Corp.*, 107 USPQ2d 2149, 2153 (TTAB 2013) ("Language in the notice of opposition such as 'including, but not limited to,' ... is vague and indefinite and does not provide fair notice of the specific marks on which opposer is relying...."); *Fair Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1538 (TTAB 2007) (elements of each claim should include enough detail to give the defendant fair notice).

Thus, to the extent that Petitioner seeks to rely on prior common law rights in its marks for software, such a claim was not pleaded, and "[a] plaintiff may not rely on an unpleaded claim ... a plaintiff's pleading must be amended under Fed. R. Civ. P. 15(b) to assert the claim, or the claim must have been tried by express or implied consent." *Brooklyn Brewery Corp. v. Brooklyn Brew Shop*, 2020 USPQ2d 10914, at *3 (TTAB 2020). Petitioner never amended the Petition for Cancellation to assert common law use of its marks for software, and Respondent's objection to any such assertion establishes that "there has been no express consent," *Brooklyn Brewery*, 2020 USPQ2d 10914, at *3.

With respect to whether Petitioner's common law rights were tried by implied consent, Fed. R. Civ. P. 15(b)(2) provides, in relevant part, that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Implied consent can only be found

EXHIBIT A

Cancellation No. 92073785

where the non-offering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1656 (TTAB 2010) ("*Citigroup I*") (quoting TBMP § 501.03(b)), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011) ("*Citigroup II*"). "The question of whether an issue was tried by consent is basically one of fairness. The non-moving party must be aware that the issue is being tried, and therefore there should be no doubt on this matter." *Morgan Creek Prods. Inc. v. Foria Int'l Inc.*, 91 USPQ2d 1134, 1139 (TTAB 2009).

Here, the issue of whether Petitioner uses its SET mark on software, including mobile apps, was tried by the implied consent of the parties. Respondent was clearly aware that certain evidence was being offered in support thereof and it did not object. Indeed, Petitioner took the testimony of Mr. Budreau on this issue and Respondent did not object.[63] Respondent also cross-examined Mr. Budreau on this point,[64] and Petitioner took re-direct testimony on this subject without objection.

Although the issue was tried by implied consent, Petitioner did not prove by a preponderance of the evidence that it uses the mark SET on software or mobile apps. Rather, Petitioner's witness, Mr. Budreau, testified that Petitioner uses various other marks, that do not contain the term SET, to identify its software and mobile apps. For example, on direct examination, he testified that some the software names are:

---

[63] *See, e.g.*, 14 TTABVUE (Budreau 117:7-20).

[64] *See, e.g.*, *id*. at 198:15-21.

**EXHIBIT A**

Cancellation No. 92073785

Replica,[65] Masimo Professional Health App,[66] Masimo Personal Health App,[67] Masimo SafetyNet App,[68] or Masimo Sleep.[69] On cross-examination, Mr. Budreau acknowledged that SET is not used in the names of the software and apps. Although Mr. Budreau offered some equivocal testimony regarding the appearance of the term SET when the software is in use,[70] there are no corroborating materials showing such use. To the contrary, Petitioner's apps and software marketed in brochures and app download pages under those marks with little or no mention of SET.[71] One material describing the REPLICA software does not contain any reference to the term SET, and the Google Play download pages for MASIMO PERSONAL HEALTH and MASIMO PROFESSIONAL HEALTH apps only provide the following information in the small print describing features: "[f]eaturing Masimo® Signal Extraction Technology® (SET®), which has been shown to provide accurate pulse oximetry measurements..." Without additional evidence demonstrating how consumers encounter the term SET in connection with Petitioner's software, we cannot assume

---

[65] *Id*. at 117:7-9, 130:1-9.

[66] *Id*. at 148:11-22.

[67] *Id*. at 155:6-12.

[68] *Id*. at 199:7-13.

[69] *Id*. at 156:9-14.

[70] For example, Mr. Budreau testified "I don't think the name appears on every screen, but I believe we have a splash screen that prominently displays the name" (*id*. at 200:13-15) and he "believe[d]" the term appeared on the "splash screen," but he did not "know for sure" if the term ever appeared again when the software was in use (*id*. at 200:16-201:1-3).

[71] See 40 TTABVUE 161-168.

**EXHIBIT A**

Cancellation No. 92073785

that SET is perceived as a source-identifier for the software or apps, as opposed to Petitioner's proprietary Masimo SET technology.

In short, Petitioner has not demonstrated prior trademark use of the term SET on software and we give no further consideration to Petitioner's argument or reliance upon such putative prior common law rights. Instead, we base our findings and analysis as to Petitioner's Section 2(d) claim solely on the goods identified in Petitioner's pleaded registrations.

## V.   Likelihood of Confusion

Trademark Act Section 2(d) prohibits the registration of a mark that:

> [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

Our analysis is based on all of the probative evidence of record. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*" – noting the factors to be considered). In making our determination, we consider each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Capital City Bank Grp.*, 98 USPQ2d 1261; *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination").

In applying the *DuPont* factors, we bear in mind the fundamental purposes underlying Trademark Act Section 2(d), which are to prevent confusion as to source

**EXHIBIT A**

Cancellation No. 92073785

and to protect trademark owners from damage caused by registration of confusingly similar marks. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 224 USPQ 327, 331 (1985); *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995); *DuPont,* 177 USPQ at 566.

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). We discuss below these factors, and the other *DuPont* factors for which there is evidence and argument.

### A.   Strength of Petitioner's Marks

Before we evaluate the similarity or dissimilarity of the parties' marks, we first consider the strength or weakness of Petitioner's marks. Marks are assessed on a spectrum that varies from very strong to very weak. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC,* 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017). The strength, or any weakness, of Petitioner's marks helps determine the scope of protection to which they are entitled.

In this case, Petitioner argues that its "SET marks are strong and warrant broad protection."[72] Respondent, in contrast, argues that the evidence "demonstrate[s] that [Petitioner's] marks are weak, that there are a large number of coexisting uses of

---

[72] 44 TTABVUE 32.

- 23 -

**EXHIBIT A**

Cancellation No. 92073785

marks incorporating 'SET' for goods that are closer to [Petitioner's] goods than [Respondent's] goods are, and that [its] RESET and RESET-O marks should be allowed to continue to coexist."[73]

Thus, we consider Petitioner's marks for their conceptual strength, based on the nature of the marks themselves, and their commercial strength, based on marketplace recognition of the marks. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength …."). A mark's commercial strength is affected by the number and nature of third-party uses of similar marks for similar goods. *DuPont,* 177 USPQ at 567.

### 1. Conceptual/ Inherent Strength

Here, because Petitioner's marks are registered on the Principal Register without a claim of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f), they are presumed to be inherently distinctive for the goods recited in those registrations. *Tea Bd. of India v. Republic of Tea, Inc.*, 80 USPQ2d 1881, 1889 (TTAB 2006).

Petitioner also argues that its SET-formative marks "are each an arbitrary term when used in connection with Petitioner's [goods]."[74] There is no evidence to suggest otherwise and Respondent does not argue that the acronym SET or word "set" has any particular meaning in connection with the involved goods.

---

[73] 45 TTABVUE 48.

[74] 44 TTABVUE 32.

**EXHIBIT A**

Cancellation No. 92073785

Although Respondent submitted third-party registrations for marks containing the term SET, Respondent does not argue that these registrations help show that SET has a suggestive meaning in connection with the goods identified in Petitioner's registrations. *Cf. Top Tobacco*, 101 USPQ2d at 1173 (TTAB 2011) (third party registrations indicate term CLASSIC has suggestive meaning as applied to tobacco products); *Tektronix*, 189 USPQ at 694-695 (third-party registrations may be used "in the same way that dictionaries are used" to establish a term has meaning). In any event, when we consider the third-party registrations and the goods therein for this purpose, we find no descriptive or suggestive meaning in the term SET in connection with Petitioner's goods,[75] and Respondent has thus failed to persuade us that the marks in Petitioner's pleaded registrations are conceptually or inherently weak.

Accordingly, Petitioner's SET-formative marks are inherently strong in connection with the sensors and monitors used in the medical field.

## 2. Commercial Strength

The fifth *DuPont* factor enables Petitioner to prove that its pleaded marks are entitled to an expanded scope of protection by adducing evidence of its strength. *DuPont*, 177 USPQ at 567 (referred to as "[t]he fame of the prior mark (sales, advertising, length of use").

---

[75] The registrations, at best, help show that the term "set" may have some significance in connection with catheters or intravenous sold as a set. However, there is no additional information or evidence showing that this meaning is applicable to Petitioner's goods.

EXHIBIT A

Cancellation No. 92073785

Petitioner argues that its SET marks are commercially strong and, indeed, have "achieved fame in the medical industry."[76] In support, Petitioner points to the following:

- In 2007, an international consulting and market research company, Frost & Sullivan, recognized Petitioner with a "Industry Best Practices Award" and as an industry leader in pulse oximetry based on its "Masimo Set" technology.[77] Petitioner is also purportedly identified by Frost & Sullivan as "ranking number one in the pulse oximetry industry" and its "Signal Extraction Technology (Masimo SET) [is the] gold 'gold standard' for reliable pulse oximetry monitoring."[78]

- Since 1995, the technology used in Petitioner's monitors, called "Masimo SET technology," has been used or evaluated in more than 100 clinical or independent studies.[79]

- Petitioner's U.S. annual revenue is approximately 700 million dollars;[80] and

- Petitioner's sensors are used in the treatment of "approximately 100 million patients each year" and in "nine of the top ten hospitals according to the 2019-2020 US News & World Report Best Hospitals Honor Roll."[81]

Based on Petitioner's arguments and the entirety of the record, including evidence not mentioned above, Petitioner's marks, particularly the SET mark, have enjoyed some success and recognition within the field of sensors and monitors used in

---

[76] 44 TTABVUE 32.

[77] 14 TTABVUE 71–72, 488 (Budreau Dep. 66:8–67:18, Ex. 7). The Exhibit consists of printouts from Petitioner's website listing awards that Petitioner has received over time. Budreau Dep. 64:22-65:4.

[78] *Id.*

[79] *Id.* at 37-38 (Budreau Dep. 32:22–33:18, testifying based on statements made in Exhib. 2 (Petitioner's Form 10-K for fiscal year ending December 28, 2019).

[80] *Id.* at 27-28 (Budreau Dep. 22:10–21)

[81] *Id.* at 35-37 (Budreau Dep. 33:21–34:17). In its brief, Petitioner states that it "sells millions of sensors each year branded with its RD SET, RD RAINBOW SET, RD LITE SET, and RD RAINBOW LITE SET marks." 44 TTABVUE 33. However, Petitioner does not point to evidence that supports this statement.

**EXHIBIT A**

Cancellation No. 92073785

connection pulse oximetry technology. However, we do not have before us sufficient evidence regarding the volume of sales for goods specifically sold under its SET or RD SET marks, advertising expenditures in connection with the goods sold under these marks, or widespread notice by independent sources of the goods identified by the marks. As Petitioner's witness testified, many of its products are sold under different marks that do not contain the term SET—when asked if it is correct that Petitioner's products that "use or feature the SET technology," he replied "they go by a lot of different names, yes" and that he did think that they "ever have the word 'SET' in the product name."[82]

Moreover, because Petitioner often uses the term SET to refer to its proprietary technology, and not necessarily to identify a particular product, we cannot ascertain with any certainty how well-known Petitioner's SET marks are in connection with its sensors and monitors. As Petitioner's witness testified, "Masimo SET," or SET, refers to Petitioner's proprietary algorithm and technology contained in some of Petitioner's products and the software displays physiological values (or readings) based on this technology—for example, the Replica software is used in connection with a product that "show[s] Masimo SET's readings on its display."[83] Thus, although Petitioner was recognized in 2007 by a consulting and market research company for its "ranking number one in the pulse oximetry industry" or for its "impressive progression of Signal Extraction Technology (Masimo SET)," it is difficult to extrapolate from this

---

[82] *Id.*, Budreau Dep. 182:8-20.

[83] *Id.* at 180:13-14.

EXHIBIT A

that Petitioner's SET or RD SET marks are well known by consumers as marks used on its sensors and monitors. In other words, we cannot equate Petitioner's success with its SET proprietary technology with consumer recognition of its SET marks on its products like sensors and monitors.

In sum, Petitioner's evidence demonstrates its SET mark has an elevated, but moderate, amount of commercial strength, and the fifth *DuPont* factor, accordingly, weighs in favor of finding confusion likely.

As to sixth *DuPont* factor and Respondent's submission of third-party registration and use evidence, we are not persuaded on this record that Petitioner's mark, SET, and its other SET marks, is weakened commercially based on extensive third-party use of similar marks on related goods.

We disagree with Respondent's contention that the record demonstrates "a large number of coexisting uses of marks incorporating 'SET' for goods that are closer to" Petitioner's goods, in comparison to Respondent's goods.[84] Respondent submitted copies of twenty-five third-party registrations for marks that include the term SET and cover goods having a medical purpose; however, only the following eight registrations are accompanied by evidence showing current use of the marks:[85]

---

[84] 45 TTABVUE 48.

[85] As explained, *supra*, Respondent submitted what purportedly are specimens of use in the registration files for thirteen, third-party registrations, but we excluded these materials pursuant to Petitioner's objection. *See* the discussion in the Record and Evidentiary Objections section. In addition, Respondent submitted four registration files, without specimens from the files or any evidence of use; these registrations, by themselves, are not evidence that the registered marks have been used in commerce or that consumers are familiar with such marks. Put simply, third-party registrations, with no evidence of use of the marks in commerce, do not diminish the commercial strength of Petitioner's marks. "We have frequently said that little weight is to be given such [third-party] registrations in

EXHIBIT A

Cancellation No. 92073785

1. **SLICK SET** (SET disclaimed) for "catheters with catheter guides and endotracheal tubes with endotracheal tube guides" in Class 10;[86]

2. **QUICK-SET** for "medical devices, namely a configuration of tubing and needles or tubing and cannulas for the subcutaneous administration of fluids" in Class 10.[87]

3. **COMBISET** for "medical apparatus namely, hemodialysis blood tubing set with intravenous administration set and transducer protectors" in Class 10.[88]

4. **SAFESET** for "medical devices, namely, apparatus for taking blood samples" in Class 10.[89]

5. **SETPOINT MEDICAL** (MEDICAL disclaimed) for "medical devices, namely, devices used to treat chronic inflammatory and autoimmune disorders in the nature of neurostimulators which activate the body's inflammatory reflex to reduce inflammation" in Class 10.[90]

6. **SOF-SET** for "medical fluid infusion apparatus" in Class 10.[91]

7. **PLUMSET** for "apparatus for the intravenous administration of medical fluids" in Class 10.[92]

8. **SUB-Q-SET** for "infusion sets for subcutaneous administration of fluids" in Class 10.[93]

---

evaluating whether there is likelihood of confusion. The existence of these registrations is not evidence of what happens in the market place or that customers are familiar with them ...." *In re Embiid,* 2021 USPQ2d 577, at *34 (TTAB 2021) (quoting *AMF Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973).

[86] Reg. No. 2531847 issued January 22, 2002; renewed.

[87] Reg. No. 2550788 issued March 19, 2002; renewed.

[88] Reg. No. 2323483 issued February 29, 2000; renewed.

[89] Reg. No. 4294582 issued February 26, 2013.

[90] Reg. No. 5454239 issued April 24, 2018.

[91] Reg. No. 1884809 issued March 21, 1995; renewed.

[92] Reg. No. 1560710 issued October 17, 1989; renewed.

[93] Reg. No. 1170042 issued September 22, 1981; renewed.

**EXHIBIT A**

Cancellation No. 92073785

Three of the registrations (the second, fourth and seventh) are owned by the same entity.

Although the goods covered by the registrations have a medical purpose, this does not by itself mean that the goods are related to those covered by Petitioner's registrations. The Board has held that goods are not related merely because they both can be deemed to be within the broadly-defined medical field. *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399 (TTAB 2009). Here, of the eight registrations for which Respondent submitted evidence of use, none have a readily apparent or demonstrated relationship to Petitioner's sensors and monitors. Respondent's conclusory statement that the third-party goods are "closer" to Petitioner's goods cannot be taken as true without supporting evidence and further explanation. For the aforementioned reasons, the quality and quantity of evidence of third-party registration and use of the term SET are insufficient and the evidence does not demonstrate commercial weakness of that term. Accordingly, the sixth *DuPont* factor is neutral in our likelihood of confusion analysis.

### B.   The Similarity or Dissimilarity of the Parties' Marks

We now consider the similarity or dissimilarity of the parties' marks in their entireties as to appearance, sound, connotation and commercial impression, the first *DuPont* factor. *DuPont,* 177 USPQ at 567. *See Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005).   "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB

**EXHIBIT A**

Cancellation No. 92073785

2018), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)) (quoted in *Chutter,* 2021 USPQ2d 1001, *35).

Here, we limit our comparison to Petitioner's SET and RD SET marks because, of Petitioner's pleaded marks, these two bear the closest resemblance to Respondent's RESET and RESET-O marks. If we find a likelihood of confusion as to these marks and the associated goods, we need not find it as to Petitioner's other marks. Conversely, if we do not find a likelihood of confusion as to these marks, we would not find it as to Petitioner's other marks. *See, e.g., The N. Face Apparel Corp. v. Sanyang Indus. Co.,* 116 USPQ2d 1217, 1225 (TTAB 2015) (citing *In re Max Capital Grp. Ltd.,* 93 USPQ2d 1243, 1245 (TTAB 2010)).

In terms of appearance and sound, Petitioner's SET mark is similar to Respondent's RESET and RESET-O marks which incorporate this term. Respondent's addition of the prefix RE- and the addition of the ending -O in one mark, however, are points of difference.

As to Petitioner's RD SET mark, it can be verbalized in a manner that sounds similar to Respondent's marks. That is, consumers are likely to pronounce the individual letters "R" "D" followed by "SET;" this will resemble a consumer's pronunciation of the term RESET. In addition, although RD is spaced apart from SET in Petitioner's mark, the marks bear visual similarity.

As to the meanings or connotations conveyed by the parties' marks, there is no dispute that the terms SET and RESET are identifiable words. As discussed, the term SET has no significance in connection with Petitioner's goods. Although Petitioner

**EXHIBIT A**

Cancellation No. 92073785

uses the term as an acronym for its technology ("single extraction technology"), the evidence does not show that consumers will be aware of this and may simply believe Petitioner's use of the term SET is arbitrary.

Each term has multiple meanings in English, including:[94]

SET: "To put or bring into a specified state."

RESET: "To set up or fix in the proper position or order again; to restore to the original position or arrangement."

Relying on the latter defined meaning and its software being used for opioid and substance use disorders, Respondent contends that "[c]learly, the word 'reset' when applied to [Respondent's] goods is suggestive of—but does not directly describe— attributes of [Respondent's] cognitive behavioral therapy PDTs, including the notion that the products help patients start over, move 'back to an original place,' or 'press a special button or to make changes' so that they can get their lives back on track."[95]

While the suggestive connotation proposed by Respondent is certainly plausible and may distinguish the marks in terms of meaning, the terms SET and RESET remain inherently similar because the former can be understood as placing a person or thing into a specified state and the latter may be perceived as "resetting" or

---

[94] Definitions taken from online Oxford English Dictionary (www.oed.com), March 2022. Oxford University Press (accessed May 13, 2022). Petitioner introduced a dictionary definition for "reset" as "to set again or anew." 18 TTABVUE 120 (taken from online Merriam-Webster dictionary. Respondent offered several definitions for the term "Reset," including one that is substantially the same as that above, and requested the Board take judicial notice thereof. We have considered the dictionary definitions provided by Petitioner and Respondent, as well as the ones provided above. *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006).

[95] 45 TTABVUE 26.

**EXHIBIT A**

Cancellation No. 92073785

"restoring" to the original state. In other words, while the respective sole, or dominant, term in each mark may have a somewhat different defined meaning, consumers may still perceive a connection between the two marks based on their connotations.

In sum, as to the first *DuPont* factor, we find the marks are marginally more similar than dissimilar in appearance, sound, meaning and commercial impression. This factor slightly supports a finding that confusion is likely.

### C.    Relatedness of the Parties' Goods

We now turn to the comparison of the goods at issue, the second *DuPont* factor.

It is settled that it is not necessary that the respective goods be identical or even competitive in order to find that they are related for purposes of our likelihood of confusion analysis. They need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that goods emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); *see also In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984); *In re Melville Corp.*, 18 USPQ2d 1386, 1388 (TTAB 1991).

The parties acknowledge in their trial briefs that the proper analysis regarding the relatedness of the goods should be made with respect to the goods as identified in Respondent's involved registrations and Petitioner's pleaded registrations. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) (quoting *Octocom Sys., Inc. v. Hous. Computs. Servs. Inc.*, 918

**EXHIBIT A**

Cancellation No. 92073785

F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed.")); *see also Paula Payne Prods. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) ("Trademark cases involving the issue of likelihood of confusion must be decided on the basis of the respective descriptions of goods").

Petitioner's goods are:

- Electronic sensors and monitors for extracting signals from data containing noise;

- In vivo patient monitors and sensors for detecting a physiological condition; Electronic sensors and monitors for extracting signals from data containing noise; and

- Medical devices, namely, patient monitors and patient sensors for monitoring and measuring blood properties, tissue properties, pulse rate, brain function or respiratory properties.

Respondent's goods are:

- Software for the treatment of opioid use disorder, namely, software for collecting information and data from and for delivering information and therapy to patients with opioid use disorder; and

- Software for the treatment of substance use disorder.

Petitioner argues that Respondent's software is "highly related" to Petitioner's monitors and sensors.[96] Specifically, Petitioner contends the goods are related

---

[96] 44 TTABVUE 41.

EXHIBIT A

Cancellation No. 92073785

because Respondent's software allows doctors and clinicians to "monitor the patient's progress in a substance abuse program through a mobile app and clinician-facing dashboard," and Petitioner's monitors and sensors "are used in connection with monitoring those using prescribed opioids, and are in development for use monitoring persons in treatment for opioid addiction."[97] Petitioner also takes issue with Respondent's claims that its software is a "prescription digital therapeutic," available by prescription only, and that its software is "currently enrolled in outpatient treatment under the supervision of a clinician, therapist, doctor, or other provider for the treatment of SUD [substance use disorder]."[98] Petitioner contends that Respondent's software, as described in its registrations, is not so limited and the Board should "not read into the descriptions the limitations that Respondent now claims."[99]

Respondent argues that "the mere fact that [Petitioner's] SET pulse oximetry products sometimes may be used to monitor patients prescribed opioids or persons suffering from opioid addiction should not have any bearing on the likelihood of confusion analysis."[100] In particular, Respondent contends that the evidence is lacking for purposes of showing relatedness:[101]

> [Petitioner] has put forward no evidence whatsoever that persons using
> opioids comprise any of its actual customers, let alone an appreciable

---

[97] *Id.*

[98] *Id.*, citing to Respondent's responses to interrogatories and the testimony of Respondent's witness (Carlson Dec. ¶¶ 4, 7–12, 37 TTABVUE).

[99] *Id.* at 42.

[100] 45 TTABVUE 31.

[101] *Id.* at 31-32.

EXHIBIT A

Cancellation No. 92073785

number of its customers, or that persons using opioids have any influence on customer decisions to purchase products incorporating [Petitioner's] SET technology. [Petitioner] also proffers no evidence that the clinicians who prescribe [Respondent's] RESET and RESET-O cognitive behavioral therapy PDTs to patients in outpatient care settings have any responsibility for purchasing the pulse oximeters used in ICUs, surgery units, emergency departments, long term care facilities, and the like. It is customer overlap—not the generalized opioid user "connection" that [Petitioner] seeks to establish—that potentially matters for purposes of the Section 2(d) analysis.

In its rebuttal brief, Petitioner rejects Respondent's reliance on evidence for purposes of "illustrating the specific meaning of [Respondent's] goods,"[102] because the identifications of goods in Respondent's registrations have "no confounding terms that require explanation through extrinsic evidence."[103] Petitioner asserts that "Respondent chose a broad and unrestricted description of goods when it filed its applications and cannot now add limitations to avoid cancellation."[104] Thus, Petitioner reiterates that "Respondent's registrations are not limited to a different industry" and "[b]oth Respondent and Petitioner offer products in the medial (sic) field,"[105] and, more particularly, that both parties' goods are similar because they may be involved in connection with "the treatment of opioid addiction" or those "persons using opioids."[106]

In reviewing the involved registrations' identifications of goods and to Petitioner's point that these identifications should not be improperly narrowed or restricted based

---

[102] *Id*. at 10, quoting Respondent's brief at 45 TTABVUE 35.

[103] *Id*.

[104] *Id*.

[105] *Id*.

[106] 47 TTABVUE 9.

EXHIBIT A

Cancellation No. 92073785

on extrinsic evidence, we agree. Respondent's software, as described in the registrations, is not limited to "prescription only" nor is the software restricted to patients enrolled in an outpatient treatment program under medical supervision. Furthermore, the identifications are neither vague nor contain specific terms that require clarification. To be clear, Respondent's goods include software, prescription or non-prescription, used for the treatment of opioid and substance use disorders in all reasonable settings for use of such software.

Nevertheless, when giving "full scope" to the identifications of goods in Petitioner's and Respondent's registrations, as we must, *Stone Lion*, 110 USPQ2d at 1163, the record does not establish that the parties' respective goods are related.

Here, the evidence of a relationship between Petitioner's monitors and sensors and Respondent's software is tangential at best. Petitioner's evidence shows that its sensors and monitors can be used by medical personnel to monitor patients who have been prescribed opioids in order to prevent respiratory issues. Respondent's software, on the other hand, is used for the **treatment** of substance and opioid abuse disorders.

As Respondent points out in its argument, there is only a vague "generalized opioid user 'connection'" between these goods. The evidence does not show, for example, that these are the types of goods that consumers would expect to emanate from a common source or that those purchasing software for treating opioid and substance abuse would also be consumers of Petitioner's monitors and sensors, even if the latter goods are used to prevent adverse medical conditions that may result from opioids. Again, we are mindful that the mere fact that the involved goods can be

EXHIBIT A

Cancellation No. 92073785

classified as within the medical field does not mean the goods are related. *Edwards Lifesciences*, 94 USPQ2d 1399 (no likelihood of confusion found despite nearly identical marks where goods were sold to different medical professionals).

Although Petitioner has demonstrated that it had made forays into the market for monitoring patients for the safe use of opioids, opioids are not included in its identification of goods, and there is no evidence that "monitoring" and "treatment" are necessarily related. Petitioner's witness Mr. Budreau testified to various opioid-safety projects and products for monitoring patients undergoing opioid treatment, but these are marketed under different marks, e.g., "Masimo Patient SafetyNet" (or just "SafetyNet") and BRIDGE.[107] Specifically, Petitioner's "SafetyNet" product is described as being used for monitoring for any opioid-induced respiratory issues and this product "uses" or "incorporates" the "Masimo SET technology."[108] Petitioner's BRIDGE-branded product is described as a device that is "worn behind the ear, and this helps people who are dealing with opioid withdraw symptoms," but it "does not have the SET technology."[109] The evidence does not show that Petitioner's monitors and sensors bearing the SET or RD SET mark are associated with the products used in connection with monitoring opioid safety or withdrawal.

Respondent's software, in contrast, is for therapeutic purposes, namely the treatment of persons having opioid and substance abuse disorders. Respondent's

---

[107] 14 TTABVUE (Budreau Dep. 76:20; 85:9; 122:8).

[108] *Id*. at 76:20; 85:9.

[109] *Id*. at 122:9-17.

**EXHIBIT A**

Cancellation No. 92073785

software provides therapeutic information and instruction to persons with opioid or substance abuse disorders and allows clinicians to oversee the status or progress of the therapy. Respondent's witness testified that the software does not monitor a patient's physiological conditions such as "heart rate or blood pressure," or the ECG of the patient that's receiving treatment.[110] The record does not show that software, like that described in Respondent's registrations, could include a feature or ability to monitor a patient's physiological condition in real-time. In other words, Petitioner has not bridged the gap between its sensors and monitors, that may be used for monitoring physiological conditions, and Respondent's therapeutic software used for the treatment of substance and opioid abuse.

In sum, Petitioner has not demonstrated that its monitors and sensors are related to Respondent's software. As discussed, although each party's goods may be classified generally in the medical field, the goods have distinctly different purposes with no real relationship to each other. Accordingly, the second *DuPont* factor favors Respondent and supports a finding that confusion is not likely.

### D. Similarity or Dissimilarity of the Parties' Trade Channels, Classes of Consumers, Purchasing Conditions and Consumer Sophistication

The third *DuPont* factor assesses the similarity or dissimilarity of the parties' established, likely-to-continue trade channels. *DuPont*, 177 USPQ at 567. Under the fourth *DuPont* factor, we consider "[t]he conditions under which and buyers to whom sales are made, *i.e.*, 'impulse' vs. careful, sophisticated purchasing." *Id.*

---

[110] 40 TTABVUE (Carlson Dep. 57:5-10, 67:7-19).

EXHIBIT A

Cancellation No. 92073785

Because there are no specific trade channel or class-of-consumer restrictions in any of Petitioner's registrations, the respective goods are presumed to move in all normal trade channels to all normal classes of purchasers for those goods. *De Vivo v. Ortiz*, 2020 USPQ2d 10153, at *13. While Petitioner further argues that "given the identical or highly related nature of the parties' goods" and lack of restrictions, there is a presumption that the parties' goods will "travel through the same channels of trade to the same classes of consumers,"[111] the goods are clearly not identical, and thus this presumption does not apply.

Petitioner further argues that the evidence shows that the parties' trade channels and target consumers are "identical" because Petitioner "markets [its] products through direct marketing, print advertising, trade shows and digital advertising, including emails and social media" and Respondent's software is "also sold or distributed to, recommended, and prescribed by doctors and clinicians, as well as therapists."[112] Petitioner thus posits the following scenario for how confusion may occur:[113]

> A doctor or clinician familiar with Petitioner's well-known SET and RAINBOW SET technology will mistakenly believe Respondent's RESET and RESET-O branded software is related to or sponsored by Petitioner. This confusion will occur prior to issuing the prescription for Respondent's software to the patient. Patients obtaining a prescription for Respondent's software, who are familiar with Petitioner's MightySat and iSpO2 consumers products, will also mistakenly believe Respondent's monitoring software is related or sponsored by Petitioner.

---

[111] 44 TTABVUE 43.

[112] *Id.* at 43-44.

[113] *Id.* at 44.

- 40 -

**EXHIBIT A**

Cancellation No. 92073785

Respondent, on the other hand, argues that the "plain language of the parties' registrations therefore necessarily implicate different marketplace realities for the parties' respective products—*i.e.*, they are purchased and used by different customers in different settings for different purposes."[114] Respondent contends that "the record shows that there are inherent differences between the parties' goods, and by extension, their customers and trade channels, that the Board is entitled to consider." Specifically, Respondent relies on the testimony of its witness establishing that it sells its software to "physicians, therapists, clinicians, counselors and counseling centers that specifically treat patients suffering from substance and opioid use disorders in an outpatient context." Respondent's customers include "clinicians and counseling centers providing cognitive behavioral therapy to patients," are very different from Petitioner's customers.[115]

Respondent also takes issue with any characterization of the evidence as showing "identical" trade channels "merely because both parties generally sell to health care providers."[116] Respondent asserts that there is "no evidence whatsoever that the purchasers buying its pulse oximetry technology and devices are the same as the doctors who would prescribe [Respondent's] cognitive behavioral therapy PDTs to

---

[114] 45 TTABVUE 37.

[115] *Id.* at 39, citing to Carlson Decl. ¶¶ 8, 10, 16, 33.c (37 TTABVUE) and Carlson Dep. 116:21-117:1 (40 TTABVUE).

[116] *Id.* at 39.

EXHIBIT A

patients with substance use disorders," and that Petitioner hypothetical scenario for confusion was "only unsupported attorney argument."[117]

Upon review on the record, we find the established trade channels for the parties' goods are quite different. Respondent's witness has testified that Respondent's software is used to "provide[ ] cognitive behavioral therapy, including transmucosal buprenorphine and contingency management, for patients 18 years of age and older who are currently enrolled in outpatient treatment under the supervision of a clinician, therapist, doctor, or other provider for the treatment of [opioid and substance use disorders]."[118] "[A] clinician first prescribes the PDT to the patient" and then after a "review and determining the patient's need and fit for the program, [Respondent] sends the patient a unique password and link for downloading the [software] and completing the onboarding process."[119] Respondent markets its software "through its websites and direct sales consultants to physicians, therapists, clinicians, and counselors/counseling centers" involved in the treatment of substance and opioid abuse disorders.[120]

Petitioner has not demonstrated that its sensors and monitors sold under the SET or RD SET marks are marketed to consumers who are involved in the treatment of substance or opioid abuse disorders. Although Petitioner sells its goods to "hospitals, emergency medical service (EMS) providers, home care providers, long-term care

---

[117] *Id.*

[118] 37 TTABVUE, Carlson Dec. ¶¶ 8 and 10.

[119] *Id.* at ¶ 13.

[120] *Id.* at ¶ 16.

**EXHIBIT A**

Cancellation No. 92073785

facilities, physician offices, veterinarians and consumers through [its] direct sales force, distributors and original equipment manufacturers (OEM) partners to hospitals, EMS providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers,"[121] it has not shown that these entities are involved in the treatment of substance or opioid abuse disorders. And, while Petitioner will "market in a number of ways ... [including] print advertising ... digital advertising ... e-blasts, email automation to our customers ... social media, especially to our consumer audience ... trade shows ... [and] through our direct sales,"[122] this provides little insight into how such marketing will also reach consumers for Respondent's goods. For example, Petitioner's witness did not identify the names or types of trade shows that it attends to promote its monitors and sensors or explain how these are trade shows where one would also expect to encounter software used for treating with substance or opioid abuse disorders.

Petitioner is correct that Respondent's registrations describe its software more broadly than Respondent's witness. Thus, the trade channels for software are not necessarily limited to outpatient treatment or for patients that have been carefully vetted. Rather, based on the identifications, there is the possibility that software for the treatment of opioid and substance abuse disorders may be found in other trade channels.

---

[121] 14 TTABVUE 289 (Budreau Dep. Exhib. 2, 2019 SEC Form 10-K).

[122] 14 TTABVUE 179 (Budreau Dep. 174:8-15).

EXHIBIT A

Cancellation No. 92073785

The problem for Petitioner, though, is that the record is void of evidence showing any other established trade channels for software like Respondent's and, if they exist, how they are the same or are similar to those for Petitioner's sensors and monitors. For example, while Respondent's software encompasses opioid and substance abuse treatment software that is non-prescription or for in-patient use, it has not been shown what are some of the customary trade channels for this software. In other words, while we must construe the identifications in the registrations as broadly as reasonably possible, any similarity of trade channels remains to be proven.

In terms of the level of care which the parties' respective purchasers will exercise in their purchasing decisions, the parties acknowledge that there is a level of sophistication. It has also long been recognized that purchasers of medical equipment, whether hospital personnel or physicians, are highly sophisticated and, as such, are more likely to distinguish between marks and goods than is the general consuming public. *In re N.A.D.*, 754 F.2d 996, 224 USPQ 969, 971 (Fed. Cir. 1985) ("The record shows the machines to be elaborate, sizeable, complex pieces of technical apparatus of the kind which would be purchased only in consultation with an anesthesiologist or someone with equivalent technical knowledge. In other words, only very sophisticated purchasers are here involved who would buy with great care and unquestionably know the source of the goods."); *Pfizer Inc. v. Astra Pharm. Prods. Inc.*, 858 F. Supp. 1305, 33 USPQ2d 1545, 1562 (S.D.N.Y. 1994) ("The consumers here are doctors, as sophisticated a group as one could imagine."

**EXHIBIT A**

Cancellation No. 92073785

Here, given the inherent nature of Petitioner's sensors and monitors, as well as Respondent's software for the treatment of opioid and substance abuse disorders, those looking to purchase these different goods constitute two distinct groups of sophisticated purchasers. On the one hand, Petitioner's consumers will use sensors and monitors in connection with monitoring physiological conditions and will presumably seek out products that reliably and accurately detect and monitor such conditions. On the other hand, Respondent's consumers are interested in purchasing software that can fundamentally treat patients with substance or opioid abuse disorders. In addition, given the price points for the respective goods, the parties' respective consumers unlikely to make impulse purchases.

Accordingly, we find the third and fourth *DuPont* factors, involving trade channels, classes of consumers, purchasing conditions and consumer sophistication, all support a finding the confusion is unlikely.

### E.   Absence of Actual Confusion

The eighth *DuPont* factor considers the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion." *DuPont*, 177 USPQ at 567. "The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by [defendant] of its mark for a significant period of time in the same markets as those served by [plaintiff] under its marks." *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1660; *Gillette Canada Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). In other words, for the absence of actual confusion to be probative, there must have been

EXHIBIT A

Cancellation No. 92073785

a reasonable opportunity for confusion to have occurred. *Barbara's Bakery Inc. v. Landesman,* 82 USPQ2d 1283, 1287 (TTAB 2007).

Here, and in contrast to the analysis as to the second, third, and fourth *DuPont* factors, the eighth *DuPont* factor requires us to look at the **actual market conditions**, to the extent there is evidence of such conditions of record. *In re Guild Mortgage Co.*, 2020 USPQ2d 10279, at *6 (TTAB 2020). In other words, we do not simply rely on the respective identifications of goods, but we may consider, in assessing this factor, evidence of how Petitioner's and Respondent's goods are found in the marketplace and, in this context, whether there is the potential for confusion to occur. Such an analysis makes the absence, if there is one, of actual confusion more meaningful. *Id.*

Here, Respondent only points out that Petitioner "admits that there has been no actual confusion between" the parties' marks and that it is unaware of any actual confusion "despite nearly five years of concurrent use of the parties' respective marks and products, and commercial success for both."[123] The probative value of the absence of any reported instances of confusion, by itself, is diminished given the relatively short period of time in which the parties' marks and goods have been coexisting. *Citigroup v. Capital City Bank*, 94 USPQ2d at 1660; *Gillette Canada,* 23 USPQ2d at 1774, *Barbara's* Bakery, 82 USPQ2d at 1287. Additionally, as discussed in the context of their trade channels and classes of consumers, the record does not show that the actual marketing conditions of the parties' respective goods under their respective

---

[123] 40 TTABVUE 48.

EXHIBIT A

Cancellation No. 92073785

marks would have presented any real opportunity for actual confusion to have occurred in the five years.

We therefore find the eighth *DuPont* factor to be neutral in our likelihood of confusion analysis.

### F.   The Thirteenth *DuPont* Factor

The thirteenth *DuPont* factor considers "[a]ny other established fact probative of the effect of use." *DuPont*, 177 USPQ at 567. Respondent argues, under the guise of this factor, that Petitioner's "products are not called SET."[124] Respondent points out that despite Petitioner's emphasis that its products "use" or incorporate "SET technology," many of the products are sold under various other names that do not contain the term SET, such as ROOT, RADICAL-7, MASIMO PATIENT SAFETYNET, etc.[125] Respondent relies on the testimony of Petitioner's witness as well as photographs and brochures for Petitioner's products in arguing that "the mark SET does not appear **at all** on many of these products," or if it does, "it is almost always in connection with the 'MASIMO' house mark."[126] Respondent argues that these circumstances are "important" for demonstrating why confusion is "all but impossible" because "[w]hen customers buy [Petitioner's] product, they are almost never buying a product called "SET"—instead, they are buying a product with

---

[124] *Id.* at 50.

[125] *Id.*

[126] *Id.* at 50-51, referencing Budreau Dep. 182:8-20, Ex. 2. (14 TTABVUE 187, 290). In his testimony, Mr. Budreau states that its products "go by a lot of different names" and he does not think that "products that feature Masimo SET technology ever have the word 'SET' in the product name." Budreau Dep. 182:11-20.

EXHIBIT A

Cancellation No. 92073785

another name, such as ROOT or UNIVIEW, none of which is remotely close to [Respondent's] RESET and RESET-O marks."[127]

Despite Respondent's assertions, we keep in mind that Petitioner's pleaded marks are registered and are not being challenged; thus, to the extent that Respondent is attacking their validity as source identifiers for the goods listed in the registrations, this is improper. A Principal Register registration evidences the registrant's ownership of the mark, and the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate. 15 U.S.C. § 1057(b).

To the extent that Respondent is arguing that consumers have limited exposure to Petitioner's marks, we find such arguments are more directed to the degree of strength of Petitioner's marks, or the fifth *DuPont* factor. In this regard, we have considered the entire record, including Mr. Budreau's testimony regarding the extent of Petitioner's use or manner in which Petitioner's marks appear on its goods, as well as other materials showing the same.

In sum, Respondent's argument that the thirteenth *DuPont* factor is applicable because Petitioner does not use its SET mark on its goods is not well taken, and the factor is neutral in our analysis.

## G.   Likelihood of Confusion—Conclusion

Because there is no real demonstrated relationship between Petitioner's sensors and monitors and Respondent's software for the treatment of opioid and substance

---

[127] *Id*. at 51.

EXHIBIT A

Cancellation No. 92073785

abuse disorders and there is no evidence demonstrating that these goods are offered in the same channels of trade to the same classes of consumers, we do not find that confusion is likely. We make this ultimate conclusion despite finding the involved marks are overall slightly more similar than not, and despite our finding that Petitioner's SET marks are inherently strong with moderate commercial strength. Balancing the factors for which there has been evidence and argument, we find Petitioner has not demonstrated by a preponderance of the evidence that confusion is likely.

**Decision:**

The Petition for Cancellation of Respondent's Registration Nos. 5138595 and 5740689 is denied.

**EXHIBIT A**